UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                            :

AURELIUS CAPITAL MASTER, LTD.;      :
ACP MASTER, LTD.; NOVORIVER S.A.;  :
683 CAPITAL PARTNERS, LP; ADONA LLC;  :
EGOZ I LLC; EGOZ II LLC; MASTERGEN,  :
LLC; ERYTHRINA, LLC; AP 2016 1, LLC; AP  :
2014 3A, LLC; AP 2014 2, LLC; WASO  :
HOLDING CORPORATION; APE GROUP SPA;  :
ROMANO CONSULTING SPA; ICARO SRL;  :      No.
and ELAZAR ROMANO,                  :

                                        :      **COMPLAINT**

                    Plaintiffs,      :

                                  :

      - against -                  :

                                  :

THE REPUBLIC OF ARGENTINA,      :

                    Defendant.      :

                                  :
---------------------------------------------------------------x

          Plaintiffs Aurelius Capital Master, Ltd.; ACP Master, Ltd.; Novoriver

S.A.; 683 Capital Partners, LP; Adona LLC; Egoz I LLC; Egoz II LLC; Mastergen,

LLC; Erythrina, LLC; AP 2016 1, LLC; AP 2014 3A, LLC; AP 2014 2, LLC; WASO

Holding Corporation; Ape Group SpA; Romano Consulting SpA; Icaro SRL; and

Elazar Romano (collectively, "**Plaintiffs**"), by their undersigned counsel, allege as

follows, based upon knowledge as to their own acts and upon information and belief as

to all others:

          1.       Plaintiffs bring this action pursuant to N.Y. C.P.L.R. § 205(a)

following the termination of six prior, coordinated actions in this Court (the "**Prior**

**Actions**").[1]  In accordance with C.P.L.R. § 205(a):  (i) the Prior Actions were timely commenced by Plaintiffs; (ii) the Prior Actions were terminated in a manner other than "a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits;" (iii) this action is based "upon the same transaction or occurrence or series of transactions or occurrences" as the Prior Actions; and (iv) this action is being commenced and service is being effected within six months of the termination of the Prior Actions.

2.      Specifically, Plaintiffs commenced the Prior Actions against defendant The Republic of Argentina (the "**Republic**" or "**Argentina**") on various dates between January 14, 2019 and December 10, 2020 based upon the Republic's breach of its obligations for the year 2013 under securities it had issued, namely the 2005-issued U.S. Dollar-Denominated New York law GDP-Linked Securities (ISIN: US040114GM64) and the 2010-issued U.S. Dollar- Denominated New York law GDP-Linked Securities (ISIN: XS0501197262).  These securities are referred to herein respectively as the "**2005 GDP Securities**" and the "**2010 GDP Securities**", and collectively as the "GDP Securities" or the "Securities".

---

[1] The Prior Actions are:  (i) *Aurelius Capital Master, Ltd. v. The Republic of Argentina*, No. 19-cv-351 (LAP) (S.D.N.Y.); (ii) *ACP Master, Ltd. v. The Republic of Argentina*, No. 19-cv-10109 (LAP) (S.D.N.Y.); (iii) *Novoriver S.A. v. Argentine Republic*, No. 19-cv-09786 (LAP) (S.D.N.Y.); (iv) *683 Capital Partners, LP v. The Republic of Argentina*, No. 19 Civ. 10131 (LAP) (S.D.N.Y.); (v) *Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, and WASO Holding Corp. v. The Republic of Argentina*, No. 19 Civ. 11338 (LAP) (S.D.N.Y.); and (vi) *Ape Group SpA, Romano Consulting SpA, Icaro SRL, and Elazar Romano v. The Republic of Argentina*, No. 20 Civ. 10409 (LAP) (S.D.N.Y.).

4899-9278-6568.1

3.      On or around April 1, 2024, this Court dismissed the Prior
Actions on Argentina's motion for summary judgment and concluded that "it is
unnecessary to reach . . . the merits of Plaintiffs' breach-of-contract claims."  Instead,
the Court ruled only on what it characterized as a "threshold" question and found that
Plaintiffs had failed to comply with the procedural requirements of the No-Action
Clause contained in the GDP Securities governing documents.

4.      Plaintiffs appealed the dismissal of the Prior Actions and, on
September 25, 2024, while Plaintiffs' appeal was pending, they commenced an initial
action pursuant to N.Y. C.P.L.R. § 205(a) (the "**Initial 205(a) Action**").  The Republic
moved to dismiss the Initial 205(a) Action, contending that it was premature while the
appeal from the Prior Actions was pending.  Plaintiffs and the Republic stipulated to
dismiss the Initial 205(a) Action without prejudice and that, so long as Plaintiffs "file a
new action pursuant to N.Y. C.P.L.R. § 205(a) within six (6) months from the issuance
of the mandate in the Appeal (a 'Post-Appeal CPLR 205(a) Action'), such Post-Appeal
CPLR 205(a) Action shall be, for purposes of N.Y. C.P.L.R. § 205(a), commenced
within six months after the termination of the Prior Actions, and the Republic shall not
contend otherwise."  On February 24, 2025, this Court so-ordered that stipulation, a
copy of which is attached hereto as Exhibit A.

5.      On August 29, 2025, the United States Court of Appeals for the
Second Circuit issued its mandate affirming this Court's dismissal of the Prior Actions
because Plaintiffs had failed to comply with the procedural requirements of the No-
Action Clause, also without reaching the merits of Plaintiffs' claims.

4899-9278-6568.1

6.      Since the dismissal of the Prior Actions, Plaintiffs have complied with the No-Action Clause and now timely bring this action pursuant to C.P.L.R. § 205(a) based on the same transactions and occurrences as the Prior Actions.

## NATURE OF THE ACTION

7.      This is an action for breach of contract and breach of the covenant of good faith and fair dealing and the prevention doctrine brought to recover amounts due on the Securities for 2013.  As discussed further below, the key issues in this action have already been determined adversely to Argentina in an English judgment that is now final and binding on the Republic.

8.      Argentina issued the GDP Securities in 2005 and 2010 as part of exchange offers pursuant to which defaulted debt previously issued by Argentina was exchanged for new securities issued by Argentina.  In the exchange offers, holders of defaulted bonds received new bonds representing a steep "haircut" from the face amount (or interest coupon) of the bonds they were tendering, plus contingent debt securities consisting of the GDP Securities or substantially identical securities denominated in other currencies.

9.      The "**Governing Documents**" for the GDP Securities are:  (i) the Indenture (a copy of which is attached hereto as Exhibit B); (ii) the 2005 Form of Registered Global Security (the "**2005 Global Security**"), applicable to the 2005 GDP Securities only (a copy of which is attached hereto as Exhibit C); (iii) the First Supplemental Indenture, dated as of April 30, 2010, applicable to the 2010 GDP Securities only (a copy of which is attached hereto as Exhibit D); and (iv) the 2010 Form of Registered Global Security (the "**2010 Global Security**"), applicable to the 2010 GDP Securities only (a copy of which is attached hereto as Exhibit E).  The 2005

and 2010 Global Securities are substantially the same and are referred to herein collectively as the "**Global Securities**".  Unless otherwise defined, all capitalized terms used herein have the meanings set forth in the Global Securities.

10.    For each calendar year (what the Global Securities refer to as a "Reference Year", sometimes referred to herein as "**RY**") through the earlier of 2035 or when the Payment Cap is reached, the GDP Securities obligated Argentina to make a payment—the Payment Amount—subject to three conditions.  One condition concerns the Payment Cap, and the other two conditions compare the level and growth of Actual Real GDP to the level and growth of Base Case GDP.  The Base Case GDP figures (which, as discussed below, are subject to adjustment) are set forth in the Global Securities.

11.    The Actual Real GDP figures are supposed to be published by Argentina's statistical agency—the *Instituto Nacional de Estadística y Censos* (or National Institute of Statistics and Censuses), known by its Spanish acronym "**INDEC**", which is part of Argentina's Ministry of Economy ("**MECON**").  INDEC publishes Actual Real GDP measured in the constant prices of a given year.  When the GDP Securities were issued, INDEC published Actual Real GDP measured in constant 1993 prices and consequently, 1993 was the Year of Base Prices under the Global Securities. On March 27, 2014, Argentina announced that INDEC would change the Year of Base Prices (a "**rebasing**"), only publish Actual Real GDP measured in constant 2004 prices going forward, and stop publishing Actual Real GDP measured in constant 1993 prices immediately.

4899-9278-6568.1

12.     However, even after a rebasing, the GDP Securities' plain terms expressly require that Argentina perform calculations needed to determine the payment conditions and Payment Amount using (among other things) Actual Real GDP measured in constant 1993 prices.  Specifically, when a rebasing occurs, the contract requires that the Base Case GDP figures in the Global Securities be multiplied by an "**Adjustment Fraction**" calculated specifically for each Reference Year.  For Reference Year 2013, the numerator is 2013 Actual Real GDP measured in constant prices of the new Year of Base Prices (2004), and the denominator is 2013 Actual Real GDP measured in constant 1993 prices.  For Reference Year 2013, the Republic failed to perform the contractually required calculations to determine the Adjustment Fraction and the rest of the calculations required by the Securities, and it failed to publish the contractually-required input for the denominator of the Adjustment Fraction.

13.     In the fall of 2013, Argentina knew that economic growth was on track to trigger a multi-billion dollar Payment Amount on the Securities for Reference Year 2013 that would further deplete the country's already dwindling foreign currency reserves.  And by the beginning of 2014, it knew that, under the plain terms of the contract, it would owe that Payment Amount regardless of whether it rebased.  So, as its credit was downgraded and threatened with future downgrades due to losses of foreign currency reserves, the Republic took two critical steps to avoid the plain terms of the contract and its payment obligations.

14.     *First*, the Republic stopped publishing Actual Real GDP measured in constant 1993 prices.  It did so even though it was required by the Global Securities to calculate the Adjustment Fraction for each Reference Year, and the

4899-9278-6568.1

denominator of that fraction is Actual Real GDP measured in constant 1993 prices for each Reference Year. And it did so even though INDEC could have published the figure for 2013 Actual Real GDP measured in constant 1993 prices and would have published the figure if instructed to do so.

15.    In fact, the Republic went a step further. In the early months of 2014, the Republic had a working estimate of Actual Real GDP measured in constant 1993 prices for the full year 2013 that showed a payment was due. Notwithstanding that INDEC had already published figures for the first three quarters of 2013, and normally would have published Actual Real GDP for the full year by March 2014, the Republic discouraged INDEC from publishing Actual Real GDP measured in constant 1993 prices for the full year 2013. In doing so, the Republic knew that it was impeding its ability to comply with the plain terms of the Global Securities, including the determination of the payment conditions and calculation of the Payment Amount for Reference Year 2013, and frustrating the ability to establish that the payment conditions had been met and a Payment Amount was due for Reference Year 2013.

16.    **Second**, the Republic purported to unilaterally change the calculations required by the Global Securities. The Republic asserted in the Prior Actions that no payment was due for 2013 because, supposedly, Actual Real GDP Growth for 2013 *measured in constant 2004 prices* did not exceed Base Case GDP Growth for 2013 *measured in constant 1993 prices—i.e.*, without adjusting the Base Case GDP figures as required by the contract. In the Prior Actions, this Court rejected the Republic's use of unadjusted Base Case GDP for 2013 to determine the Base Case GDP Growth threshold as "atextual."

17.     Separately, the Republic breached the requirement set forth in the Global Securities that the Adjustment Fraction be calculated for each Reference Year. Instead of calculating the Adjustment Fraction for each Reference Year as required by the plain words, the Republic decided—based on nothing more than its own self-serving views of the supposed "spirit" of the GDP Securities—it would use a single constant adjustment fraction based on data from one Reference Year chosen by the Republic, and apply that constant adjustment fraction to all Reference Years.  Under this extra-contractual constant adjustment fraction, a rebasing may affect whether the payment conditions have been met, and indeed, the Republic contends no Payment Amounts are due for 2013 based upon its extra-contractual constant adjustment fraction.  In contrast, calculating the Adjustment Fraction separately for each year, as required by the plain terms of the Global Securities, ensures that a rebasing cannot affect whether the payment conditions have been met, and results in a large payment being due on the GDP Securities for Reference Year 2013.

18.     In doing all of the above, the Republic breached the contract in at least six ways.

19.     **First**, the Republic breached the contract by failing to perform calculations it was obligated to perform.  The contract required that the Republic calculate the Adjustment Fraction for RY 2013 using 2013 Actual Real GDP measured in constant 1993 prices, calculate Base Case GDP for RY2012 and RY2013 using the respective Adjustment Fraction for each Reference Year, calculate Base Case GDP Growth for RY2013 using those Base Case GDPs, calculate whether the payment

8

conditions for RY2013 were met, and (if so) calculate the Payment Amount.  The Republic did none of that.

20.     **Second**, the Republic breached the contract by failing to publish the data required by the contract. The contract required 2013 Actual Real GDP measured in constant 1993 prices to determine the Adjustment Fraction and in turn perform the various contractually mandated calculations to determine the payment conditions and Payment Amount. Argentina failed to publish that data.

21.     **Third**, the Republic breached the contract by failing to obtain the consent of a supermajority of Holders before modifying the contractual payment formulas when it purported to use unadjusted Base Case GDP to determine the Base Case GDP Growth threshold and an extra-contractual constant adjustment fraction.

22.     **Fourth**, the Republic breached the covenant of good faith and fair dealing.  Under that covenant, the Republic may not: (1) engage in conduct that would have the effect of destroying or injuring the other party's right to receive the fruits of the contract, or (2) violate a promise that a reasonable person would be justified in understanding was included.  By failing to publish 2013 Actual Real GDP measured in constant 1993 prices, using the extra-contractual constant adjustment fraction, and failing to perform the contractually-required calculations, the Republic destroyed or injured the right to receive the Payment Amount for Reference Year 2013 otherwise due under the contract.  Likewise, owners of the Securities were justified in understanding that the Republic impliedly promised to publish Actual Real GDP measured in constant 1993 prices for Reference Year 2013 after a rebasing where doing so was necessary to

perform the calculations mandated by the Global Securities, and avoid depriving owners of the Securities of a payment that was due.

23.    *Fifth*, the Republic breached the prevention doctrine.  Under that doctrine, the Republic may not: (1) do anything which will have the effect of destroying or injuring the other party's right to receive the fruits of the contract or (2) act in such a way as to frustrate or prevent the occurrence of a condition precedent.  The Republic's conduct—failing to publish Actual Real GDP measured in constant 1993 prices for Reference Year 2013, adopting an extra-contractual constant adjustment fraction, and failing to perform the contractually-required calculations—had the effect of destroying, injuring or impeding the right to receive the 2013 Payment Amount otherwise due under the contract.  The Republic has also taken the position that non-publication of Actual Real GDP measured in constant 1993 prices means the conditions for payment for Reference Year 2013 cannot be calculated in accordance with the plain terms of the contract.  Thus, by failing to publish the necessary data, the Republic has also frustrated or prevented the occurrence of a condition precedent.

24.    *Finally*, the Republic breached by not paying the Payment Amount due for 2013.  If Argentina had complied with the contract—including publishing 2013 Actual Real GDP in constant 1993 prices, following the plain language of the adjustment provision, and using adjusted Base Case GDP to calculate Base Case GDP Growth—Argentina should have paid $1,321,922,620, or 7.680% of the notional amount of all the GDP Securities, on December 15, 2014 as the Payment Amount for Reference Year 2013.  Plaintiffs are entitled to establish liability and damages for the Republic's breaches of contract and seek judgment for the unpaid Payment Amount due

10

to the Holders for Reference Year 2013, including without limitation the portion of the Payment Amount for Reference Year 2013 representing each Plaintiff's beneficial ownership interest in Securities.  Plaintiffs also seek applicable pre- and post-judgment interest as to all amounts due.

25.    While not essential to the causes of action herein, in doing all of the above, the Republic committed manifest error and acted arbitrarily, willfully and in bad faith, with full knowledge that it was not following the plain terms of the Global Securities and that its conduct would have the effect of destroying the right to the Payment Amount for Reference Year 2013.[2]

26.    As to most of the key issues in this action, Argentina is bound by the final, non-appealable determinations adverse to it in another litigation (the "**English Litigation**").  That litigation involved a series of Argentina's GDP-Linked Securities with terms virtually identical to the GDP Securities here but denominated in Euros and governed by English law (the "**English Law Securities**").  In that case, the High Court of Justice, Business and Property Courts of England & Wales entered judgment against the Republic for the "total Payment Amount" in respect of Reference Year 2013 as well as to "Claimants . . . [for] proportion of the Judgment Sums reflecting their beneficial entitlement under the Securities" (the "**English Judgment**", a copy of which is attached hereto as Exhibit F, along with the English court's subsequent Order).  The English Judgment was unanimously affirmed on appeal, the Republic's request for

_____

[2] Indeed, the Republic concealed the fact that it was using unadjusted Base Case GDP and its alternative constant adjustment fraction for almost a decade—revealing what it had done only after it had been sued.

4899-9278-6568.1

further review has been denied, and the English Judgment is now final.  The Republic

has yet to satisfy the English Judgment.

27.     Notably, the English courts held, over the Republic's objection,

in favor of the key tenets of the present action: (1) that the Adjustment Fraction operates

exactly as Plaintiffs assert and must be calculated separately for each Reference Year

and that the Republic's constant adjustment fraction alternative is "simply irreconcilable

with" the contractual language; (2) that 2013 Actual Real GDP measured in constant

1993 prices was 491.3 billion Argentine pesos (exactly as Plaintiffs have alleged); (3)

that the payment conditions were satisfied for Reference Year 2013 in precisely the

fashion Plaintiffs contend here; and (4) that the Payment Amount should be calculated

precisely as Plaintiffs contend here except for two formulaic differences specified in the

contracts to reflect the difference in currency of denomination.  As a result, the English

court determined that on December 15, 2014 the Republic should have paid

€1,329,760,063.39 on the English Law Securities in respect of Reference Year 2013,

precisely corresponding to the $1,321,922,620 the Republic should have paid on that

date to the Holders of the Securities at issue here.

28.     The English Judgment with respect to these issues is binding on

the Republic here.  In the Governing Documents, the Republic expressly "agree[d] that

a final non-appealable judgment in any Related Proceeding"—such as the English

Judgment—"shall be conclusive and binding upon it."  Indenture (Ex. B) § 12.8(a),

2005 Global Security (Ex. C) § 17(a), 2010 Global Security (Ex. E) § 15(a).  Even in

the absence of such contractual provisions, basic principles of collateral estoppel

preclude the Republic from re-litigating these issues.  They are the same issues here, the

Republic had a full and fair opportunity to litigate them in England (and did, in fact, litigate them over more than three years of litigation before the English court), and they were necessary for the English Judgment, which is now final.

29.      As a result of the English Judgment, the Republic is precluded from relitigating here: (1) that 2013 Actual Real GDP measured in constant 1993 prices was 491.3 billion Argentine pesos; (2) that the payment conditions for the Securities have been met for RY 2013; and (3) the 2013 Payment Amount other than to show how it should be adjusted to take into account the difference in currency of denomination and the notional amounts of the GDP Securities compared to the English Law Securities.

## THE PARTIES

30.      There is a single Holder for each of the 2005 GDP Securities and the 2010 GDP Securities.  Cede & Co. is the Holder for the 2005 GDP Securities and The Bank of New York Depositary (Nominees) Limited is the Holder for the 2010 GDP Securities.  Plaintiffs are each beneficial owners of one or both of the 2005 GDP Securities and the 2010 GDP Securities, and as discussed herein, have the right to bring this action under the No-Action Clause.

31.      Plaintiff Aurelius Capital Master, Ltd. is a Cayman Islands exempted company.  It is the beneficial owner of $739,559,967 notional amount of 2005 GDP Securities and $57,599,231 notional amount of 2010 GDP Securities. Aurelius Capital Management, LP ("**ACM**"), the management company for Aurelius Capital Master, Ltd., was located in New York at the time of the purchases of the GDP Securities on which Aurelius Capital Master, Ltd. has brought suit.

32.     Plaintiff ACP Master, Ltd. is a Cayman Islands exempted company.  It is the beneficial owner of $503,558,976 notional amount of 2005 GDP Securities and $935,704,368 notional amount of 2010 GDP Securities.  ACM, the management company for ACP Master, Ltd. was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

33.     Plaintiff Novoriver S.A. is a *sociedad anónima* organized under the laws of the Oriental Republic of Uruguay.  It is the beneficial owner of $93,201,124 notional amount of 2005 GDP Securities and $89,825,232 notional amount of 2010 GDP Securities.

34.     Plaintiff 683 Capital Partners, LP is a Delaware limited partnership.  It is the beneficial owner of $291,331,000 notional amount of 2005 GDP Securities.  The management company for 683 Capital Partners, LP was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

35.     Plaintiff Adona LLC is a Delaware limited liability company.  It is the beneficial owner of $120,000,000 notional amount of 2005 GDP Securities.

36.     Plaintiff Egoz I LLC is a Delaware limited liability company.  It is the beneficial owner of $95,101,000 notional amount of 2005 GDP Securities and $17,719,000 notional amount of 2010 GDP Securities.  The management company for Egoz I LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

37.     Plaintiff Egoz II LLC is a Delaware limited liability company.  It is the beneficial owner of $59,399,000 notional amount of 2005 GDP Securities and $9,281,000 notional amount of 2010 GDP Securities.  The management company for

Egoz II LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

38.     Plaintiff Mastergen, LLC is a Delaware limited liability company.  It is the beneficial owner of $424,654,388 notional amount of 2005 GDP Securities and $131,100,000 notional amount of 2010 GDP Securities.

39.     Plaintiff Erythrina, LLC is a Delaware limited liability company. It is the beneficial owner of $47,902,911 notional amount of 2005 GDP Securities.

40.     Plaintiff AP 2016 1, LLC is a Delaware limited liability company.  It is the beneficial owner of $93,547,937 notional amount of 2005 GDP Securities.  The management company for AP 2016 1, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

41.     Plaintiff AP 2014 3A, LLC is a Delaware limited liability company.  It is the beneficial owner of $10,324,000 notional amount of 2005 GDP Securities.  The management company for AP 2014 3A, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

42.     Plaintiff AP 2014 2, LLC is a Delaware limited liability company.  It is the beneficial owner of $9,672,519 notional amount of 2005 GDP Securities.  The management company for AP 2014 2, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

43.     Plaintiff WASO Holding Corporation is an Exempted Company incorporated in the Cayman Islands.  It is the beneficial owner of $841,976,210 notional amount of 2005 GDP Securities.  The management company for WASO Holding Corporation was located in New York at the time of the purchases of the GDP

Securities on which it has brought suit.  Adona LLC; Egoz I LLC; Egoz II LLC; Mastergen, LLC; Erythrina, LLC; AP 2016 1, LLC; AP 2014 3A, LLC; AP 2014 2, LLC; and WASO Holding Corporation are referred to collectively herein as the "**Adona Plaintiffs**".

44.     Plaintiff Ape Group SpA is a *società per azioni* organized under the laws of the Italian Republic.  It is the beneficial owner of $18,000,000 notional amount of 2005 GDP Securities.

45.     Plaintiff Romano Consulting SpA is a *società per azioni* organized under the laws of the Italian Republic.  It is the beneficial owner of $21,000,000 notional amount of 2005 GDP Securities.

46.     Plaintiff Icaro SRL is a *società a responsabilità limitata* organized under the laws of the Italian Republic.  It is the beneficial owner of $5,000,000 notional amount of 2005 GDP Securities.

47.     Plaintiff Elazar Romano is a citizen of the Italian Republic.  He is the beneficial owner of $82,000,000 notional amount of 2005 GDP Securities.

48.     Defendant the Republic of Argentina is a foreign state as defined in 28 U.S.C. § 1603(a).

## JURISDICTION, VENUE AND CHOICE OF LAW

49.     In the Governing Documents (as defined herein)**,** Argentina explicitly and irrevocably waived sovereign immunity to the fullest extent permitted by the laws of the United States in any action with respect to the GDP Securities.  Thus, Argentina is not entitled to immunity under 28 U.S.C. §§ 1605-1607 or under any

applicable international agreement, and this Court therefore has jurisdiction pursuant to 28 U.S.C. § 1330.

50.     In the Governing Documents, Argentina irrevocably submitted to the jurisdiction of this Court over any action with respect to the GDP Securities, and appointed *Banco de la Nación Argentina*, at its office at 225 Park Avenue, New York, New York 10169, as its authorized agent for service of process.

51.     In the Governing Documents, Argentina waived any objection based on venue or otherwise to any action with respect to the GDP Securities being brought in this Court, and venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

52.     Argentina agreed that the Governing Documents shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

## <u>COMPLIANCE WITH THE "NO-ACTION CLAUSE"</u>

53.     The Global Security and the Indenture governing the Securities authorize beneficial owners of the Securities, like Plaintiffs, to "institute any suit, action or proceeding in equity or at law upon or under or with respect to" the Securities in certain circumstances, including but not limited to if: (i) such beneficial owner previously gave the Trustee for the Securities—here, The Bank of New York Mellon— written notice of default and the continuance thereof with respect to the Securities; (ii) beneficial owners of not less than 25% in aggregate notional amount of the Outstanding Securities made a written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee; (iii) such beneficial owners provided the Trustee with reasonable indemnity and/or security as it may require against the costs,

17

expenses and liabilities to be incurred in connection with such litigation; (iv) the Trustee fails to institute any such action, suit or proceeding for 60 days after its receipt of the notice of default, request and provision of indemnity and/or security; and (v) the Trustee shall not have received a direction inconsistent with the written request. (2005 Global Security (Ex. C), § 11; 2010 Global Security (Ex. E), § 9; *see also* Trust Indenture (Ex. B), § 4.8.)

54.     On October 7, 2023, July 19, 2024, and November 12, 2025, Plaintiffs delivered notices of default to the Trustee with respect to the Republic's failure to make the payment required under the GDP Securities for Reference Year 2013, copies of which are attached hereto as, respectively, Exhibits G, H, and I.

55.     On July 25, 2024 and November 12, 2025, beneficial owners whose holdings of the 2005 and the 2010 GDP Securities exceed 25% in aggregate notional amount of the Outstanding Securities of each series, (i) made a written request to the Trustee to institute an action, in its own name as Trustee, against the Republic for its failure to make the payment required under the GDP Securities for Reference Year 2013; and (ii) provided the Trustee with reasonable indemnity and/or security against the costs, expenses and liabilities to be incurred in connection with such an action. Copies of the July 25, 2024 Request & Indemnity and the November 12, 2025 Request & Indemnity are attached hereto as, respectively, Exhibits J and K.

56.     More than 60 days have passed since the Trustee's receipt of Plaintiffs' notices of default and the July 25, 2024 Request & Indemnity and November 12, 2025 Request & Indemnity, and the Trustee has not instituted any action against the

18

Republic for its failure to make the payment required under the GDP Securities for Reference Year 2013.

57.     The Trustee has not received any direction inconsistent with the request that the Trustee institute an action against the Republic for its failure to make the payment required under the GDP Securities for Reference Year 2013.

58.     Accordingly, Plaintiffs are authorized to bring this action under Section 11 and Section 9 of the 2005 and the 2010 Global Security, respectively, and Section 4.8 of the Trust Indenture governing the GDP Securities to establish liability and damages for the Republic's breaches of contract and recover the unpaid Payment Amount due for Reference Year 2013.

## COMPLIANCE WITH
## THE PRESCRIPTION CLAUSE

59.     The Global Securities each contain a Prescription clause, which provide that "[a]ll claims against the Republic for any amounts due hereunder . . . shall be prescribed unless made within five years from the date on which such payment first became due[.]"

60.     This Court has held that in the context of the Prescription clause "[t]he only sensible construction is to attribute to the word 'claim' its ordinary, everyday meaning: an assertion of a right to something."  *Ape Group SpA v. Republic of Argentina*, 2022 WL 463309, at *3 (S.D.N.Y. Feb. 15, 2022).

61.     The Payment Date for Reference Year 2013 was December 15, 2014.

62.     On September 25, 2017, ACM (the management company for, *inter alia*, Aurelius Capital Master, Ltd. and APC Master, Ltd.) sent a letter to the

Republic asserting that the Republic "owed the holders of the [Securities] a Payment Amount for Reference Year 2013 of approximately $1.3 billion . . . that was due on December 15, 2024," but "[n]one of these amounts have been paid." That figure is the aggregate Payment Amount for all Securities, not just the portion thereof beneficially owned by the entities managed by ACM. Exhibit A to that letter set forth detailed calculations of this Payment Amount for all Securities, showing the "Payment Amount due for Ref. Year 2013 for all [Securities]" to be $1,325.9 million. A copy of the September 25, 2017 letter is attached hereto as Exhibit L.

63.     On January 14, 2019 and October 31, 2019, Aurelius Capital Master, Ltd. and ACP Master, Ltd. filed complaints in the Prior Actions asserting that "Argentina was contractually obligated to make a Payment Amount of $0.07680 per $1.00 of notional amount of [the Securities] on December 15, 2014" for a total "Payment Amount for 2013 [of] $1,321,922,620." Copies of those pleadings are attached hereto as Exhibits M and N. Likewise, in its memorandum of law in opposition to Argentina's motion to dismiss its 2019 complaint, Aurelius Capital Master, Ltd. made clear that, "the Payment Amount for 2013 is roughly $1.3 billion for all outstanding [Securities]." A copy of that memorandum is attached hereto as Exhibit O.

64.     On October 23, 2019, Novoriver S.A. filed a complaint in the Prior Actions asserting that "the [Securities] required Argentina to pay [Security] holders $1,321,922,620, or 7.680% of the [Securities'] notional amount, on December 15, 2014." A copy of that pleading is attached hereto as Exhibit P.

65.     On October 31, 2019, 683 Capital Partners, LP filed a complaint in the Prior Actions asserting that "the [Securities] required Argentina to pay . . . 7.680% of the notional amount to holders of the 2005 GDP [Securities].  That amount should have been paid on December 15, 2014."  A copy of that pleading is attached hereto as Exhibit Q.

66.     On December 11, 2019, the Adona Plaintiffs filed a complaint in the Prior Actions asserting that "the GDP Warrants require Argentina to pay, at minimum, USD $1,320,255,073.65 to holders of the GDP Warrants" for Reference Year 2013.  Adona's first claim for relief alleges that "Argentina was contractually obligated to make a Payment Amount of at least USD $0.07680 per notional dollar on December 15, 2014" and that "Argentina breached its contractual obligations by failing to . . . pay such amount when due."  A copy of that pleading is attached hereto as Exhibit R.

67.     This Court has held that Ape Group SpA; Romano Consulting SpA; Icaro SRL; and Elazar Romano "asserted a claim to payment under the [S]ecurities . . . sufficient to satisfy the prescription clause."  *Ape Group*, 2022 WL 463309, at *3.

68.     By virtue of the foregoing, because the Republic has been given proper and timely notice of the total Payment Amount due for all of the Securities in respect of RY2013, the Prescription Clause has been satisfied as to the claims asserted herein with respect to all of the Securities (and not just the portion thereof beneficially owned by Plaintiffs).

## FACTUAL ALLEGATIONS

**A.  Payment Conditions and Payment Amount for the GDP Securities**

69.     Under the terms of each Global Security, Argentina promised to pay the Payment Amount for any Reference Year if certain conditions are met: (i) Actual Real GDP exceeds Base Case GDP for the Reference Year (the "**Level Condition**"); (ii) Actual Real GDP Growth exceeds Base Case GDP Growth for the Reference Year (the "**Growth Condition**"); and (iii) as of the Calculation Date pertaining to the Reference Year, the aggregate of all payments made by Argentina under the Global Security, when added to the Payment Amount for such Reference Year, does not exceed the Payment Cap (the "**Payment Cap Condition**").

70.     Payment Amount as defined in the Global Securities "means for any Payment Date, an amount equal to (i) the Available Excess GDP (converted into U.S. dollars) for the Reference Year corresponding to such Payment Date, multiplied by (ii) the notional amount of this Security outstanding as of such Payment Date. . . ." Available Excess GDP is a function of Excess GDP, which in turn is the difference between Actual Nominal GDP and Nominal Base Case GDP.  Actual Nominal GDP and Nominal Base Case GDP are, respectively, Actual Real GDP and Base Case GDP multiplied by the GDP Deflator for the Reference Year in question.

71.     For each Reference Year, calculations to determine whether a payment is due are required to be made on the Calculation Date, defined in the Global Securities as "for any Reference Year, the 1st of November of the calendar year following such Reference Year"; and payment is required to be made on the Payment Date, defined in the Global Securities as "for any Reference Year, the 15th of December of the calendar year following such Reference Year."

22

**B.**      **The Global Securities Require the Republic to Perform Prescribed Calculations and Publish GDP Data Needed for Those Calculations**

72.     For each Reference Year, the Global Securities require MECON to perform the calculations needed to determine whether the payment conditions have been satisfied and, if so, to determine the Payment Amount.  MECON is part of the Argentine state and has no separate legal identity of its own.  Accordingly, the Republic can contractually commit MECON, and MECON's acts and omissions are the Republic's.

73.     For each Reference Year, the Actual Real GDP for that and the prior Reference Year (as well as related data) are inputs specifically required by the Global Securities to determine whether the Level Condition and the Growth Condition have been satisfied and to calculate the Payment Amount.  Actual Real GDP is defined in the Global Securities to mean "for any Reference Year the gross domestic product of Argentina for such Reference Year measured in constant prices for the Year of Base Prices, as published by INDEC."

74.     Like MECON, INDEC is part of the Argentine state and has no separate legal identity of its own.  Accordingly, the Republic can contractually commit INDEC, and INDEC's acts and omissions are the Republic's.  INDEC is a part of, and subject to hierarchical control by, MECON and, subject to direct oversight by the President.  The President may issue instructions and orders to INDEC, require INDEC to produce statistics, and even overrule INDEC's decisions.  The President also has the power (which he/she has exercised) to appoint and remove INDEC's leadership, restructure INDEC, change INDEC's position within the government, reassign INDEC

personnel, make temporary appointments, and limit the roles of temporary appointments and INDEC's leadership.

75.     The Republic represented to investors participating in the exchange offers that INDEC "is controlled by the Argentine government" and that INDEC would produce the GDP data required for MECON to make the calculations required of it under the Securities.

76.     This Court held in the Prior Actions that Argentina is required to perform "a calculation . . . using the inputs that the Adjustment Fraction requires" and that calculating the Payment Amount "ultimately requires the use of the GDP figures published by INDEC and, to the extent applicable (i.e., in the event that INDEC rebases its GDP figures), the Adjustment Fraction." *Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 2021 WL 1177465, at *7, 9 (S.D.N.Y. Mar. 29, 2021).  The English Judgment reached the same conclusion, holding it "appropriate to imply [a] term" requiring the Republic to "continue to measure and publish in 1993 prices until the expiration date" for the Securities.  (English Judgment (Ex. F) ¶¶ 228-29.)  Argentina has conceded that the Adjustment Fraction applied in accordance with its express terms as alleged herein "would also require the continued publication of the . . . 1993 base year."

77.     The Republic was therefore obligated (i) to perform the calculations under the Securities, including following the formula for the Adjustment Fraction, and (ii) to ensure that INDEC published the data contractually-required for those calculations.  Indeed, absent such obligations, the terms of the Securities would be ineffective because there would be contractual formulas for payment conditions and

24

Payment Amounts, but no assurance that the inputs for such formulas would ever be available or the calculations ever made.  Moreover, if Argentina has no obligation to publish Actual Real GDP in constant 1993 prices or perform the calculations, and the absence of that data and the calculations means there is no entitlement to payment, then it would render the Securities inherently valueless from the start and subject to the Republic's whim if it refused to publish the necessary figures.  This would be an absurd result.[3]

78.    New York law recognizes that contracts necessarily include "understandings or expectations that were so fundamental that [parties] did not need to negotiate about those expectations."  *Wieder v. Skala*, 80 N.Y.2d 628, 637 (1992).  Here, whether understood formally as an implied term, or within the scope of Argentina's express obligation to make the contract's required calculations, the answer is the same—Argentina must publish (among other things) the Actual Real GDP in constant 1993 prices even after a rebasing has occurred.  Since Argentina failed to publish that data, and use it to make the contractually prescribed calculations, as and when required by the terms of the Securities, Argentina is in breach, and Plaintiffs are entitled to establish the Republic's liability and damages for that breach based on evidence estimating what that data would have been had it been timely published.

---

[3] The English Court of Appeal understood this fundamental point, finding it "obvious" that "there must be an implied term in the Securities that the Republic is required to publish such data as is necessary for the Securities to be operable in accordance with their express terms."  *See* Exhibit S ¶ 77.

C.    **The Global Securities Set Forth the Formula for Determining the Yearly Adjustment Fractions the Republic Must Apply to the Base Case GDP Figures in the Global Securities After a Rebasing**

79.    As noted earlier, Actual Real GDP for a Reference Year is "the gross domestic product of Argentina for such Reference Year measured in constant prices for the Year of Base Prices." The concept of constant prices means that the gross domestic product is adjusted to neutralize the impact of price inflation or deflation that has occurred since a designated base year. GDP is commonly referred to as nominal GDP before this adjustment and as real GDP after it.

80.    When the GDP Securities were issued and for some time thereafter, Argentina published Actual Real GDP in constant 1993 prices, meaning prices from 1993 were used to control for the effects of inflation or deflation. The Global Securities acknowledged that the Year of Base Prices was 1993 at the time of issuance and also provided for the possibility that Argentina might later change the Year of Base Prices, commonly referred to as "rebasing." Thus, the Year of Base Prices as defined in the Global Securities "means the year 1993; provided that if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year."

81.    Because INDEC was measuring Actual Real GDP in constant 1993 prices when the Republic issued the Securities, the Global Securities initially specified the Base Case GDP figures—critical thresholds for applying the Level Condition and the Growth Condition—in constant 1993 prices. And just as the Global Securities anticipated INDEC might change the Year of Base Prices used to measure

4899-9278-6568.1

Actual Real GDP, it required an adjustment to those initial Base Case GDP figures to account for the change.

82.     Adjustment of the initial Base Case GDP figures is necessary because changing the Year of Base Prices affects the calculation of Actual Real GDP and Actual Real GDP Growth.  Actual Real GDP and Actual Real GDP Growth for any given Reference Year will change when measured in constant prices of a different Year of Base Prices.  Rebasing may, for example, cause Actual Real GDP for a given Reference Year measured in a new Year of Base Prices to be a larger or smaller figure than Actual Real GDP measured in the old Year of Base Prices (although usually larger since prices tend to rise over time), and may cause Actual Real GDP Growth also to be a larger or smaller figure.

83.     Further, the relationship between Actual Real GDP measured in the old and new Years of Base Prices varies year to year.  For example, Actual Real GDP for Reference Year 2007 measured in constant 1993 prices was 359,170 million pesos, and measured in constant 2004 prices was 684,798 million pesos;[4] the ratio of the figure in constant 2004 prices to constant 1993 prices was 1.91.  Whereas, Actual Real GDP for Reference Year 2008 measured in constant 1993 prices was 383,444 million pesos, and measured in constant 2004 prices was 706,042 million pesos; and the ratio between the two was 1.84.

---

[4] In 2016, INDEC substantially revised previously reported figures for Actual Real GDP measured in constant 2004 prices.  Unless otherwise noted, the pre-revision 2004 series is referred to herein because the revised 2004 series did not exist as of the Payment Date for Reference Year 2013.

84.     Likewise, Actual Real GDP Growth in any year will be different when measured in the old and new Years of Base Prices; and that difference in growth rates will itself vary year to year.  For example, Actual Real GDP Growth for Reference Year 2007 was 8.65% when measured in constant 1993 prices and 5.53% when measured in constant 2004 prices; and Actual Real GDP Growth for Reference Year 2008 was 6.76% when measured in constant 1993 prices and 3.10% when measured in constant 2004 prices.

85.     For each Reference Year, the payment conditions depend upon whether and the extent to which Actual Real GDP and Actual Real GDP Growth exceed Base Case GDP and Base Case GDP Growth, respectively, for that year.  Because changing the Year of Base Prices affects the measurement of Actual Real GDP and Actual Real GDP Growth, changing the Year of Base Prices could significantly affect the calculation of the Securities' payment conditions unless there is an adjustment to the initial Base Case GDP figures to account for the change in the Year of Base Prices.

86.     The provisions in the Global Securities for adjusting Base Case GDP ensure that satisfaction of the payment conditions is the same before and after a rebasing.  In the absence of the adjustment, Actual Real GDP and Actual Real GDP Growth would be measured in constant prices of the new Year of Base Prices, while Base Case GDP and Base Case GDP Growth would be measured in constant 1993 prices.  With the adjustment, the comparison between Actual Real GDP and Base Case GDP, and between Actual Real GDP Growth and Base Case GDP Growth, remains "apples to apples" as it was when the GDP Securities were initially issued and the Year of Base Prices was 1993.

87.     The adjustment provision is found in the definition of Base Case GDP.  The definition of Base Case GDP contains a chart setting forth the initial Base Case GDP values in constant 1993 prices.  The chart in the Global Security for the 2005 GDP Securities starts with Reference Year 2005.  The chart in the Global Security for the 2010 GDP Securities starts with Reference Year 2009, and for that year and all the subsequent years for the duration of the Securities, the Base Case GDP values are the same for the 2005 and 2010 GDP Securities.

88.     In addition to the chart, the "**Adjustment Provision**" in the definition of Base Case GDP dictates the adjustment that must be made to the figures in the chart when INDEC rebases:

> if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP *for each Reference Year* shall be adjusted to reflect any such change in the Year of Base Prices by *multiplying the Base Case GDP for such Reference Year* (as set forth in chart [contained in the Global Securities]) *by a fraction*, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and *the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices*.

(Emphasis added.)  Thus, if a change in the Year of Base Prices occurs, then by its terms, the Adjustment Provision requires the calculation and use of an Adjustment Fraction specific to each Reference Year comprised of a numerator—"Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices" [*i.e.,* the new Year of Base Prices after rebasing]—and a denominator—"Actual Real GDP for such Reference Year measured in constant 1993 prices."  If, for example, the change in the Year of Base Prices caused Actual Real GDP for a given Reference Year to be

50% higher than it would have been using 1993 prices, the Adjustment Fraction for that year would be 1.5, and Base Case GDP for that Reference Year would be adjusted upward by 50%.

89.    The Adjustment Fraction must be calculated separately for "each Reference Year" based upon GDP data for "such Reference Year."  A separate Adjustment Fraction for each Reference Year reflects the fact that the relationship between Actual Real GDP as measured in the old and new Years of Base Prices is not constant from year to year, and the relationship between Actual Real GDP Growth as measured in the old and new Years of Base Prices is not constant from year to year.

90.    Base Case GDP Growth for a given Reference Year, the threshold for the Growth Condition for that year, is defined as the percentage increase in Base Case GDP for that year over Base Case GDP for the prior year.  Accordingly, if Base Case GDP is adjusted pursuant to the Adjustment Provision, Base Case GDP Growth will be calculated using Base Case GDP as so adjusted.

91.    The Adjustment Provision provides important protection for investors in the GDP Securities.  At the time the Securities were issued in 2005, investors had more than five years of experience with the 1993 series; by the 2010 issuance, more than ten years.  By contrast, investors could not know when the Republic would rebase, what changes in methodology the Republic would institute as part of a rebasing, and how those changes would affect Actual Real GDP and Actual Real GDP Growth.

92.    The Adjustment Provision also prevented the Republic from using a rebasing to avoid or affect a payment that would otherwise be due—for

example, by rebasing at a time when it saw a payment would be due based on statistics in 1993 prices but not in the new Year of Base Prices, or by making methodological choices in connection with the adoption of a new Year of Base Prices that might avoid a payment. If the Level Condition and Growth Condition would have been satisfied using 1993 series data before a rebasing, the Adjustment Provision ensures that those conditions would still be satisfied after a rebasing.

93.    Just as the Global Securities require that Argentina (through INDEC) publish Actual Real GDP measured in constant prices of the new Year of Base Prices for each Reference Year, they also require that after a rebasing Argentina (through INDEC) publish Actual Real GDP measured in constant 1993 prices for each Reference Year because that figure is the denominator input for the yearly Adjustment Fractions and, thus, required for each Reference Year's calculations mandated by the Global Securities. Again, INDEC is a part of MECON and subject to direct oversight by the President, who may issue instructions and orders to INDEC and overrule INDEC's decisions. INDEC had the ability, and the Republic has the power to compel INDEC, to publish Actual Real GDP measured in constant 1993 prices, and the Republic is obligated to ensure that INDEC does so, so that after a rebasing such data would be available to calculate the contractually-required Adjustment Fraction for each Reference Year.

94.    Requiring Argentina to continue publishing Actual Real GDP measured in constant 1993 prices after a rebasing is consistent with academic literature concerning securities that are linked to GDP statistics, such as the Securities. For example, a 2004 paper published by the U.S. Council of Economic Advisors entitled,

"Growth-Indexed Bonds: A Primer" noted that "investors may worry that the revisions or any methodological changes in compiling the statistics could complicate payments on growth-indexed debt[.]" It proposed as a possible solution: "Changes to statistical methodologies could be handled by requiring governments to keep separate GDP series calculated with the old methodology, even after adopting a new technique for other purposes, until the outstanding contracts reach maturity."

95.    Likewise a 2006 paper by Stephany Griffith-Jones and Krishnan Sharma, titled, "GDP-Indexed Bonds: Making It Happen," proposed that, "[if] there was a major change in methodology of data calculation, Governments could be required to keep separate GDP series calculated with the old methodology until the bonds mature."

96.    And a 2016 paper published by the Bank of England, entitled "Sovereign GDP-linked bonds," noted that GDP estimates "are prone to revision, rebasing, and in extreme cases manipulation," and suggested as a possible solution "requiring governments or outside agencies to keep separate GDP series based on the old method (so that payments are based on a 'notional' series rather than the one following the latest methodology)."

**D.    The Republic Embarks on a Course of Conduct to Avoid Its Payment Obligations Under the GDP Securities**

***1-    The Republic Knew It Would Owe a Payment for 2013 Under the Plain Language of the Global Securities that Would Further Deplete Its Already Diminished Foreign Currency Reserves***

97.    On September 27, 2013, the Director of the ONCP (the office at MECON immediately responsible for making the calculations under the GDP Securities) sent an email to more than two dozen MECON colleagues, including the

32

Minister of Economy and the Secretary of Finance, warning that in light of data published by INDEC as of that date there would need to be a steep recession in the balance of 2013 to avoid satisfying the Growth Condition and triggering a payment on the GDP Securities for Reference Year 2013.

98.    Statistics published by INDEC after September 27, 2013 confirmed that Argentina did not go into recession in 2013.  Although Argentina never published full year 2013 Actual Real GDP measured in constant 1993 prices, had it done so, those figures would have shown that 2013 Actual Real GDP Growth measured in constant 1993 prices was approximately 4.9%, well above the unadjusted 2013 Base Case GDP Growth of 3.22%, thereby satisfying the Growth Condition and (because the other payment conditions were also met) triggering a Payment Amount due on the Securities for Reference Year 2013.

99.    MECON analyses from early 2014 noted that Argentina faced a payment of nearly $3 billion on the GDP Securities and other series of virtually identical GDP-linked securities (such as those at issue in the English Litigation) for Reference Year 2013.  These analyses also showed that a very large payment on account of Reference Year 2013 would be due even after the contemplated rebasing if INDEC published full year 2013 Actual Real GDP measured in constant 1993 prices and the Republic properly applied the Adjustment Fraction.

100.    That potential payment, according to a MECON analysis, would cause a "heavy loss" in foreign currency reserves.  At that time, Argentina's foreign currency reserves were already under intense pressure, having declined from over $50 billion in 2011 to less than $30 billion by January 2014.

33

101.    Argentine officials at MECON and the BCRA, Argentina's central bank, closely monitored the country's foreign currency reserves. As the President of Argentina acknowledged in a 2013 report: "The accumulation of reserves is the main strategy to sustain the [Argentine] peso according to the productive needs of the country. In this way, we generate a true anti-crisis insurance that allows us to reduce external vulnerability, provide certainty to public and private investment, and develop a capital market."

102.    In February 2014, DBRS, a credit rating agency, downgraded the Republic's credit rating, noting the need to "stem reserve losses" or Argentina would face further downgrades.

### 2- *The Republic Uses the Rebasing as a Pretext to Stop Publishing the Denominator of the Adjustment Provision—Actual Real GDP Measured in Constant 1993 Prices*

103.    On March 27, 2014—at around the same time when INDEC would have been expected to publish full year 2013 Actual Real GDP measured in constant 1993 prices, which, when used as the denominator of the Adjustment Fraction for 2013, would have confirmed that a payment was due to the Holders—Minister of Economy Axel Kicillof announced that (1) the Republic was changing the Year of Base Prices from 1993 to 2004; and (2) INDEC would only publish Actual Real GDP measured in constant 2004 prices going forward, and would cease publishing Actual Real GDP measured in constant 1993 prices.

104.    That same day, INDEC reported 2013 Actual Real GDP and 2013 Actual Real GDP Growth measured in constant 2004 prices. 2013 Actual Real

GDP Growth measured in constant 2004 prices was 3%.[5]  Argentina also should have published full year 2013 Actual Real GDP measured in constant 1993 prices for the denominator of the Adjustment Fraction, but it never did and, consequently, never performed the calculations required by the Global Securities.  Using the figure Plaintiffs contend (and the English court determined) for 2013 Actual Real GDP measured in constant 1993 prices, and applying the plain terms of the contract to determine Adjustment Fractions and adjusted Base Case GDP for 2012 and 2013, 2013 Base Case GDP Growth was below 2%, lower than the 3% growth in Actual Real GDP measured in constant 2004 prices.  This meant that the Growth Condition had still been met and a Payment Amount was still due for 2013, notwithstanding the rebasing.

105.    INDEC could have continued to publish Actual Real GDP measured in constant 1993 prices after the rebasing.  The cost, time and burden of doing so would have been relatively modest, and INDEC could have used much of the same data gathered to publish Actual Real GDP measured in constant 2004 prices.  Had the President directed INDEC to continue publication, it would have done so.

### 3-  The Republic Jettisons the Yearly Adjustment Fractions in the Global Securities

106.    Days after Kicillof's announcement, Guillermo Nielsen, the former Secretary of Finance who had overseen the initial issuance of the GDP Securities in 2005, co-authored a newspaper article, entitled, "To Pay or Not To Pay, the Coupon Dilemma."  The article explained that even though Base Case GDP would

---

[5] As noted, *see* footnote 4, *supra*, INDEC substantially revised Actual Real GDP measured in constant 2004 prices in 2016.  The 3% Actual Real GDP Growth figure for 2013 refers to the growth figure for the 2004 series as published by INDEC in 2014, not the later-revised GDP figures.

need to be adjusted under the plain language of the Adjustment Provision in light of the rebasing, that would not change whether a payment was due for Reference Year 2013. Nielsen and his co-author stated that "if growth for the year 2013, calculated with figures from 1993 as a basis, was 4.9%, and the new GDP figures from the years 2012 and 2013 growth was 3%, the 'basis case' with the new way of calculating would be approximately 1.38%, significantly lower than 3%." Thus, the article opined, "even with the change of basis to 2004, given the issuing standards, a growth of 3% with the new GDP would result in the coupon needing to be paid" for Reference Year 2013.

107.    Numerous high-ranking Argentine officials, including the Chief of Cabinet and the Minister of MECON were aware of and discussed Nielsen's article. ONCP staff prepared a memorandum for the Secretary of Finance, noting that under the Adjustment Provision as explained by Nielsen, the Republic would need to publish full year 2013 Actual Real GDP measured in constant 1993 prices, and that if it did so, the Growth Condition would be met and a payment triggered for Reference Year 2013.

108.    On or about April 3, 2014, Jorge Capitanich, the Republic's Chief of Cabinet, testified before the Argentine National Congress that Nielsen's explanation of the plain language of the Adjustment Provision was "not compatible with the one made by the National State" and that no payment would be made for Reference Year 2013 (even though the Calculation Date was months away). He did not explain how the Republic had reached that conclusion or why it disagreed with Nielsen, and it would be almost a decade before the Republic would disclose what it had done and then only after the commencement of litigation.

109.    What the Republic did was jettison the Adjustment Fractions that the Global Securities required it to first calculate for each Reference Year and then use in the other calculations required under the Global Securities.  Instead of following the plain words and calculating an Adjustment Fraction for each Reference Year, the Republic decided that it would calculate a fraction for just one Reference Year—what it calls the "overlap year"—which the Republic contends it can select in its sole discretion.  The numerator of the Republic's fraction would be Actual Real GDP measured in the new Year of Base Prices for the "overlap year," and the denominator would be Actual Real GDP measured in constant 1993 prices for the "overlap year." That single fraction would be applied to all Reference Years—in effect, a constant adjustment fraction.

110.    In addition to being inconsistent with the plain language of the Global Securities, a constant adjustment fraction inaccurately assumes that the impact of a rebasing is consistent from year to year, and that the relationship between the old and new GDP series is constant over time.  That is not the case, which is why the Adjustment Fraction as written is required to be calculated anew for each Reference Year.

111.    With a constant adjustment fraction, every year's Base Case GDP Growth is the same after a rebasing as before it, even though the rebasing itself is bound to affect (as it did here, materially) Actual Real GDP Growth.  Indeed, the Republic's approach would leave Base Case GDP Growth for each year unaltered regardless of whether, when, or how many times the Republic chose to rebase GDP, and regardless of what methodological and weighting changes it adopted with each rebasing.  In effect,

37

the Republic contends that to determine whether the Growth Condition has been met, one compares Actual Real GDP Growth measured in constant prices of the new Year of Base Prices, with Base Case GDP Growth measured in constant 1993 prices. Making that apples-to-oranges comparison, the Republic asserted that the Growth Condition was not satisfied, and thus no payments are due to the Holders, for Reference Years 2013 through 2020.

112.    In adopting a constant adjustment fraction, the Republic purported to rely upon the supposed "logic" and "spirit" of the contract, not the plain words. Indeed, when the Republic first disclosed that it was using a constant adjustment fraction, in January 2022 as part of an amended pleading in the English Litigation, it admitted that conforming the actual words of the Global Security to a constant adjustment fraction would require adding 32 words to the Adjustment Provision.

113.    Upon information and belief, the Republic did not actually calculate or apply a constant adjustment fraction until it was performing the calculations for Reference Year 2021, after this Court's determination that the failure to apply the Adjustment Fraction was "atextual." Prior to that time, it had simply compared Actual Real GDP Growth measured in constant 2004 prices to unadjusted Base Case GDP Growth measured in 1993 prices to wrongly determine that the Growth Condition had not been met and, therefore, failed to perform the contractually-required calculations.

114.    For Reference Year 2021, where the Growth Condition was met even under the Republic's extra-contractual approach (because 2021 Actual Real GDP Growth measured in constant 2004 prices exceeded unadjusted 2021 Base Case GDP

Growth measured in constant 1993 prices), the Republic announced for the first time in December 2022 that it had used 2012 as the "overlap year" to determine the constant fraction. The Republic did not announce what constant adjustment fraction it was actually using, but it purported to determine that the Level Condition had not been met.

115.    The English courts soundly rejected the Republic's constant adjustment fraction for a host of reasons, including:

(a) It is atextual and "simply irreconcilable with" the contractual language, including because it requires the addition of 32 words to the Adjustment Provision.

(b) The Adjustment Provision as written ensures for investors that a rebasing will not affect whether payments are due; a constant fraction does not.

(c) The yearly Adjustment Fractions ensure the effect of a rebasing is properly reflected on both sides of the Level and Growth Conditions (*i.e.*, Actual Real GDP to Base Case GDP, and Actual Real GDP Growth to Base Case GDP Growth). Otherwise, the rebasing would be reflected on the Actual Real GDP side, but not properly on the Base Case GDP side because the adjustment would not reflect the actual effect on Base Case GDP for any year other than the single overlap year used to determine the constant fraction.

(d) The Republic has discretion under its extra-contractual constant adjustment fraction to choose the "overlap year" for determining the constant fraction. That decision is significant because the choice of the "overlap year" determines the value of the constant fraction, which, in turn, affects the thresholds for the Level Condition and, consequently, the Payment Amount (if any) for every year. The Global Securities do not mention the concept of a constant fraction at all, let alone suggest any criteria for determining what single overlap year should be used to determine a constant fraction. Nothing in the Global Securities suggested that Holders wanted to give the Republic complete discretion to alter the Level Condition or the Payment Amount by selecting the overlap year for a constant fraction.

(e) The Republic's extra-contractual constant adjustment fraction "breaks the proportional link between changes in the Actual Nominal GDP and changes in the Payment Amount," such that the level and growth rate of Actual Real GDP and Actual Nominal GDP

might go up in a given year but the Payment Amount would go down, and vice versa.  The Adjustment Fraction as written preserves this link.

(f) The yearly Adjustment Fractions protect investors from the moral hazard that the Republic will make various choices most favorable to it.

### 4- The Republic Pressures INDEC to Not Publish 2013 Actual Real GDP Measured in Constant 1993 Prices

116.    Not only did the Republic fail to ensure that INDEC continued to publish Actual Real GDP measured in constant 1993 prices for Reference Year 2013, it discouraged INDEC from doing so.  In April 2014, MECON senior officials organized and had knowledge of an unprecedented meeting with INDEC, the effect of which was to ensure that INDEC did not publish Actual Real GDP measured in constant 1993 prices.

117.    Even though Kicillof had announced that INDEC would no longer publish Actual Real GDP measured in constant 1993 prices, Nielsen had made clear the figure was necessary for the GDP Security calculations.  Capitanich's congressional testimony rejected the plain language of the contract without explanation, and without addressing whether INDEC would publish 2013 Actual Real GDP measured in constant 1993 prices as Nielsen had anticipated INDEC would do.  A multi-billion-dollar payment on the Securities hung in the balance.

118.    The MECON official responsible for making the calculations required by the Global Securities, Santiago Wright, met with the INDEC official responsible for calculating Actual Real GDP, Gustavo Rodriguez.  Wright conferred with senior MECON officials in advance.  Wright and Rodriguez had never met before.

119.    Wright told Rodriguez what Capitanich had not told Congress or the public (and what the Republic would not disclose for almost a decade), *i.e.*, the Republic was going to jettison the yearly Adjustment Fractions in the Global Securities and instead use a constant adjustment fraction that did not require the continued publication of Actual Real GDP measured in constant 1993 prices.

120.    Wright asked Rodriguez whether INDEC was going to publish full year 2013 Actual Real GDP measured in constant 1993 prices. Rodriguez assured Wright that INDEC would not. Wright immediately reported that information back to his superiors at MECON.

121.    Notably, before the meeting, INDEC personnel had performed their own analysis, which included a figure for full year 2013 Actual Real GDP measured in constant 1993 prices, confirming that after a rebasing and application of the Adjustment Fraction, the Growth Condition would be met for Reference Year 2013. But, after the meeting, INDEC personnel revised the analysis to reflect the constant adjustment fraction the Republic planned to use instead of the Adjustment Fraction in the Global Securities, and which did not require publication of full year 2013 Actual Real GDP measured in constant 1993 prices. The revised INDEC analysis showed that no payment would be due to the Holders for 2013 regardless of the overlap year and constant fraction selected.

**E.    If the Republic Had Published Actual Real GDP Measured in Constant 1993 Prices for Reference Year 2013 and Applied the Yearly Adjustment Fraction, It Would Have Been Clear That A Payment Amount Was Due**

122.    Because as of the Calculation Date for Reference Year 2013—November 1, 2014—INDEC was employing 2004 instead of 1993 as the Year of Base Prices, the Global Security required that Argentina (through INDEC) publish Actual

41

Real GDP in the new Year of Base Prices (2004) and in the original Year of Base Prices (1993) so that the Adjustment Fraction in the definition of Base Case GDP could be calculated and applied.

123.    As explained below, Base Case GDP for both 2012 and 2013 are part of the calculations under the GDP Securities for Reference Year 2013, so the Adjustment Fraction for each year needed to be separately calculated.  To do so, Argentina (through INDEC) was obligated to publish Actual Real GDP in both 2004 and 1993 prices for both years.  While INDEC published Actual Real GDP in 2004 prices for 2012 and 2013, and Actual Real GDP in 1993 prices for 2012, it did not publish Actual Real GDP in 1993 prices for Reference Year 2013.

124.    Without 2013 Actual Real GDP measured in constant 1993 prices, the Republic failed to perform the calculations it was required to make under the contract.  The Republic did not calculate the 2013 Adjustment Fraction, and without that fraction, it did not adjust Base Case GDP as it was supposed to have done under the contract.  And without adjusted Base Case GDP, it did not perform any of the other calculations it needed to determine the payment conditions or Payment Amount.  Instead, the Republic applied its extra-contractual and atextual constant adjustment fraction, unilaterally modifying the terms of the contract to its advantage, in breach of the "Modifications" provision of the Global Security.

125.    The Republic's failure to publish the data necessary to make the contractually required calculations—Actual Real GDP in 1993 prices for the full year 2013—also constituted a breach of Argentina's obligations under the Global Securities. Had Argentina not so failed, it would have been clear that a payment was due under the

GDP Securities in respect of Reference Year 2013.  In an attempt to hide that payment was due, Argentina withheld the full-year 2013 figure thereby frustrating the ability to calculate the 2013 Adjustment Fraction and show that the second condition (the growth condition) to Argentina's payment obligation had been satisfied.  Argentina apparently believed that if it withheld the data to calculate the 2013 Adjustment Fraction, it could avoid having to comply with the express rebasing adjustment terms found in the definition of Base Case GDP, and unilaterally modify the terms of the contract to its advantage.

126.    While not essential to the causes of action herein, the Republic's decision to not publish 2013 Actual Real GDP in constant 1993 prices and not perform the contractually required calculations was arbitrary, willful and in bad faith.  Well aware that the Argentine economy would meet the conditions for a payment for Reference Year 2013, Argentina sought to hide that fact and stymie the ability to assert the rights to payment.  By inappropriately using the rebasing as a pretext to stop publishing Actual Real GDP in 1993 prices (in particular the figure for 2013) and stop performing the contractually required calculations, Argentina attempted to destroy or injure the right to receive the fruits of the contract.

127.    The Republic contends that because INDEC did not publish Actual Real GDP for 2013 in 1993 prices, the Adjustment Fraction cannot be calculated, and MECON is free to deviate from the plain terms of the contract.  To the contrary, it was the Republic's obligation both to perform (through MECON) the calculations as prescribed and to publish (through INDEC) Actual Real GDP for 2013 in constant 1993 prices by the Calculation Date, and the Republic bears the risk and

43

responsibility of not doing so.  Nothing in the Governing Documents shifted to the Holders the risk that INDEC would not publish the data, or that Argentina would not ensure that INDEC published the data (let alone, as happened, that Argentina would discourage INDEC from doing so).  Indeed, during road show presentations, Argentina promised investors that it would continue to publish Actual Real GDP measured in constant 1993 prices.

128.    As noted above, INDEC is a part of MECON and subject to direct oversight by the President.  The GDP Securities required that the Republic ensure that INDEC publish data that the Global Security expressly contemplates would be published by INDEC for contractual calculations to be performed by MECON.  A rebasing does not excuse the Republic from publishing Actual Real GDP in constant 1993 prices for each Reference Year, which the contract expressly identifies as an element of the Adjustment Fraction for each Reference Year.

129.    In the Prior Actions, Argentina has maintained that the "binding effect" clauses in the Global Security give the Ministry of Economy the power to ignore the express adjustment provision in the definition of Base Case GDP and re-write the definition of Base Case GDP Growth.

130.    The "binding effect" clauses are located in the definitions of Excess GDP and Payment Amount.  Each provides that the calculations performed by MECON to determine Excess GDP and the Payment Amount, respectively, "shall be binding on . . . all Holders of the Security, absent bad faith, willful misconduct or manifest error on the part of [MECON]."

131.    However, as this Court held in the Prior Actions,[6] the "binding effect" clauses—which provide that the MECON's calculations of the Payment Amount and Excess GDP (a component of Payment Amount) are binding absent "bad faith, willful misconduct or manifest error"—are not applicable to the present dispute for multiple reasons.

132.    First, the "binding effect" clauses do not permit Argentina to deviate from the plain language of the Global Security and unilaterally alter the contractually-mandated formulas for determining whether the conditions for payment have been met.  For similar reasons, the English court rejected the Republic's attempt to apply the "binding effect" clause to the determination of whether the Securities' conditions for payment were met.  *See* Exhibits T and U.  The contract makes clear that Argentina does not have the unilateral right to change any contractual formula or terms.  Such changes require supermajority votes by the Holders.  Under the "Modifications" provision of the Global Security, a change to the "method of calculation of the Payment Amounts" for a series of Securities requires the consent of the Holders of 75% of the "Outstanding" Securities of that series.  The "binding effect" clause in the definition of Payment Amount does not empower Argentina to modify the contractual formula without obtaining the requisite consents from the Holders, which was not obtained here.

133.    Second, the "binding effect" clauses are not found in the definition of Base Case GDP Growth or the provisions of the Global Security setting forth the conditions for payment, and thus, do not apply to the parties' dispute.

---

[6] *See Aurelius Cap. Master, Ltd.*, 2021 WL 1177465, at *8-9.

134.    And third, even if the "binding effect" clauses applied, they would not protect Argentina because the Ministry has acted in bad faith, with willful misconduct and in manifest error by refusing to follow the plain language of the contract when making calculations and failing to publish data required by the contract, with the goal of destroying or injuring the other party's right to receive the fruits of the contract, including but not limited to their rights to payment with respect to Reference Year 2013.

135.    If the Republic had published Actual Real GDP measured in constant 1993 prices for Reference Year 2013 and applied the yearly Adjustment Fractions to calculate Base Case GDP and Base Case GDP Growth as required by the Global Securities, it would have been apparent that the payment conditions were satisfied for Reference Year 2013, and that the Republic should have paid to the Holders on account of that year the Payment Amount of $1,321,922,620.

136.    Since the Republic failed to perform the calculations required under the contract and publish 2013 Actual Real GDP measured in constant 1993 prices, the Court can derive what the 2013 figure for Actual Real GDP in 1993 prices would have been by relying on other contemporaneous data published by INDEC as of the Calculation Date to establish liability and damages.  INDEC published Actual Real GDP in 1993 prices for the first three quarters of 2013.  It also published an index of economic activity based upon 1993 prices (the "**EMAE Index**") for the full year 2013, which took into account the Actual Real GDP data measured in 1993 prices published for the first three quarters, used information and methodology used to calculate Actual

Real GDP measured in 1993 prices,[7] and exactly tracked Actual Real GDP measured in 1993 prices.  (*See* Exhibits V & W.)  Thus, based upon data INDEC published as of the Calculation Date, the full-year Actual Real GDP for Reference Year 2013 measured in 1993 prices that INDEC should have published can be determined, and damages for all claims can be determined.

137.    Since the full-year EMAE Index based on constant 1993 prices was 4.914% greater in 2013 than 2012, the full-year Actual Real GDP measured in constant 1993 prices was necessarily 4.914% greater in 2013 than 2012.  Since 2012 Actual Real GDP in 1993 prices was ARS 468.3 billion, 2013 Actual Real GDP in 1993 prices was ARS 468.3 billion multiplied by 1.04914, or ARS 491.3 billion.  (Exhibit X, Row 5.)  Alternatively, using Actual Real GDP for the first three quarters of 2013 as published by INDEC and using the EMAE Index to estimate the fourth quarter produces the same full year figure for 2013.

138.    The English court determined the true value of 2013 Actual Real GDP measured in constant 1993 prices in exactly the same way as Plaintiffs have done here—*i.e.*, by utilizing INDEC's publication of Actual Real GDP for the first three quarters of 2013 and the EMAE Index figures for the three months of the fourth quarter, all measured in constant 1993 prices, to calculate a figure of 491.3 billion pesos for Actual Real GDP measured in constant 1993 prices for Reference Year 2013.  (English Judgment (Ex. F) ¶¶ 247-56.)  The English court's determination of this factual issue is

---

[7] According to INDEC, when it prepares the EMAE Index, it "tr[ies] to replicate, to the extent possible, the use of the sources of information and the calculation methods of the quarterly and/or annual GDP."

binding on the Republic here under the Governing Documents and principles of collateral estoppel.

139.    The adjustment fraction for Reference Year 2012 is Actual Real GDP for 2012 in 2004 prices (ARS 844.8 billion)[8] divided by Actual Real GDP for 2012 in 1993 prices (ARS 468.3 billion), or 1.80.  Actual Real GDP for 2012 in both 1993 prices and 2004 prices was published by INDEC.  Multiplying the adjustment fraction for 2012 by the Base Case GDP for 2012 from the chart in the Global Security (ARS 361.1 billion) produces an adjusted Base Case GDP figure for 2012 of ARS 651.5 billion.  (*See* Exhibit X, Rows 6-10.)

140.    The adjustment fraction for Reference Year 2013 is Actual Real GDP for 2013 in 2004 prices (ARS 869.5 billion) divided by Actual Real GDP for 2013 in 1993 prices (ARS 491.3 billion), or 1.77.  The figure for Actual Real GDP for 2013 in 1993 prices is derived using the EMAE Index data published by INDEC as of the Calculation Date for 2013; the figure for Actual Real GDP for 2013 in 2004 prices was published by INDEC.  Multiplying the adjustment fraction for 2013 by the Base Case GDP for 2013 from the chart in the Global Security (ARS 372.8 billion) produces an adjusted Base Case GDP figure for 2013 of ARS 659.7 billion.  (*See* Exhibit X, Rows 11-15.)

141.    With the adjusted Base Case GDP figures for 2012 and 2013, the Payment Amount and conditions for payment for Reference Year 2013 that should have

---

[8] After November 15, 2014, INDEC published revised data for Actual Real GDP measured in constant 2004 prices.  Such revised data would not have been available as of the Calculation Date for Reference Year 2013, and thus could not have been used to determine the Payment Amount due to the Holders for Reference Year 2013.

been calculated if Argentina had followed the terms of the contract and published the required data can be determined, as explained below and as set forth in Exhibit X.

### 1- All the Conditions for Payment Were Satisfied for Reference Year 2013

142.    The Global Security provides that the Holders of the GDP Securities are only entitled to receive the Payment Amount in respect of any Reference Year if: (i) Actual Real GDP was greater than Base Case GDP for such Reference Year, (ii) Actual Real GDP Growth was greater than Base Case GDP Growth for such Reference Year, and (iii) the aggregate payments to date under the GDP Securities and the Payment Amount do not exceed the Payment Cap. (2005 Global Security (Ex. C) § 2(b); (2010 Global Security (Ex. E) § 2(b).) For Reference Year 2013, all three of these conditions were satisfied.

143.    As to the **first condition**, Actual Real GDP for Reference Year 2013, *i.e.*, ARS 869.5 billion (Exhibit X, Row 28), is greater than Base Case GDP for Reference Year 2013, *i.e.*, ARS 659.7 billion (Exhibit X, Row 29), so the first condition was satisfied.

144.    As to the **second condition**, Actual Real GDP Growth for Reference Year 2013 was greater than Base Case GDP Growth for 2013.

145.    **Actual Real GDP Growth** as defined in the Global Security "means, for any Reference Year, the percentage change in Actual Real GDP for such Reference Year, as compared to Actual Real GDP for the immediately preceding Reference Year,

> provided that, if the Year of Base Prices employed by INDEC for determining Actual Real GDP for such Reference Year and for the immediately preceding Reference Year *shall differ*, then Actual Real GDP for the immediately preceding Reference Year shall for this

> purpose be measured using constant prices for the Year of
> Base Prices applicable to the Reference Year in respect of
> which Actual Real GDP Growth is being determined.
> (Emphasis added.)

The above-quoted provision addresses the possibility that, for the Reference Year in

question, INDEC may be using a Year of Base Prices that is different than the Year of

Base Prices it used for the immediately preceding Reference Year.  That is the situation

for Reference Year 2013.  For Reference Year 2013, INDEC was using 2004 as the

Year of Base Prices; but for Reference Year 2012, INDEC had used 1993 as the Year of

Base Prices.

146.    Accordingly, in order to determine Actual Real GDP Growth for

Reference Year 2013, it is necessary to compare Actual Real GDP for Reference Year

2013 to Actual Real GDP for Reference Year 2012 using 2004 as the Year of Base

Prices for both.  As noted above, INDEC reported Actual Real GDP for Reference Year

2013 measured in constant 2004 prices as ARS 869.5 billion.  (Exhibit X, Row 28.)

According to INDEC, Actual Real GDP for Reference Year 2012 measured in constant

2004 prices was ARS 844.8 billion.  (Exhibit X, Row 6.)  Thus, Actual Real GDP

Growth for Reference Year 2013 was 2.925% (ARS 869.5 billion divided by ARS

844.8 billion, minus 1).  (Exhibit X, Row 30.)

147.    **Base Case GDP Growth** as defined in the Global Security

"means, for any Reference Year, the percentage change in Base Case GDP for such

Reference Year, as compared to Base Case GDP for the immediately preceding

Reference Year . . . ."  As noted above, when there is a change in the Year of Base

Prices, the figure for Base Case GDP in the chart in the Global Security needs to be

adjusted.  As explained above, Base Case GDP for Reference Years 2012 and 2013

50

after making the adjustment for the change in the Year of Base Prices from 1993 to 2004 is ARS 651.5 billion and ARS 659.7 billion, respectively.  (Exhibit X, Rows 10 & 15.)  Base Case GDP Growth from 2012 to 2013 is therefore 1.263% (ARS 659.7 billion divided by ARS 651.5 billion, minus 1) (Exhibit X, Row 31), which is less than the Actual Real GDP Growth of 2.925% (ARS 869.5 billion divided by ARS 844.8 billion, minus 1) (Exhibit X, Row 30).

148.    Because Actual Real GDP Growth for Reference Year 2013 was 2.925%, exceeding Base Case GDP Growth of 1.263% for that Reference Year, the second condition was satisfied.

149.    The **third condition** is that, as of the Calculation Date for Reference Year 2013 (November 1, 2014), the Payment Amount for that Reference Year when added to all prior Payment Amounts paid by the Republic cannot exceed the Payment Cap.  The Global Security defines the **Payment Cap** as "on any given day, an amount equal to [a certain percentage—48.000% for the 2005 GDP Securities and 40.609% for the 2010 GDP Securities] of the notional amount of this Security outstanding as of such day."[9]  This third condition would limit the Payment Amount for Reference Year 2013 to be not greater than 29.960% of the notional amount—or $0.2996 per notional dollar of the GDP Securities for both the 2005 and 2010 GDP Securities.  (Exhibit X, Rows 35 & 39.)  As discussed below, the Payment Amount for

---

[9] The lower Payment Cap for the 2010 GDP Securities reflects payments made to the Holders of the 2005 GDP Securities before the issuance of the 2010 GDP Securities. The Holder of the 2010 GDP Securities is not entitled to receive such payments retroactively, but the Holders of the 2005 and 2010 GDP Securities are otherwise treated similarly going forward.

Reference Year 2013 was 7.680% of the notional amount, or $0.07680 per notional dollar, of GDP Securities (Exhibit X, Rows 33 & 37), satisfying the third condition.

### 2- *Calculation of the Payment Amount*

150.    The first step in calculating the Payment Amount for Reference Year 2013 is to multiply Actual Real GDP and Base Case GDP by the GDP Deflator to determine Actual Nominal GDP and Nominal Base Case GDP, respectively.  The **GDP Deflator** as defined in the Global Security "means, for any Reference Year, the number that results from dividing (i) the gross domestic product of Argentina for such Reference Year measured at the current prices of such Reference Year, as published by INDEC, by (ii) the Actual Real GDP for such Reference Year."  For Reference Year 2013, Argentina's GDP at current prices as published by INDEC was ARS 3,339.6 billion (Exhibit X, Row 16), and the Actual Real GDP (using 2004 as the now operative Year of Base Prices) was ARS 869.5 billion (Exhibit X, Row 17), so the GDP Deflator for Reference Year 2013 was 3.84 (Exhibit X, Row 18.)

151.    **Actual Nominal GDP** as defined in the Global Security "means for any Reference Year an amount equal to Actual Real GDP for such Reference Year multiplied by the GDP Deflator for such Reference Year."  Thus, Actual Nominal GDP for Reference Year 2013 was ARS 3,339.6 billion (*i.e.*, ARS 869.5 billion multiplied by 3.84).  (Exhibit X, Row 16.)

152.    **Nominal Base Case GDP** as defined in the Global Security "means, for any Reference Year, an amount equal to Base Case GDP for such Reference Year multiplied by the GDP Deflator for such Reference Year."  Thus, the Nominal Base Case GDP for Reference Year 2013 was ARS 2,533.7 billion (*i.e.*, ARS 659.7 billion multiplied by 3.84).  (Exhibit X, Row 19.)

153.    The difference between Actual Nominal GDP and Nominal Base Case GDP is Excess GDP.  **Excess GDP** as defined in the Global Security "means, for any Reference Year, the amount (expressed in billions of Argentine pesos), if any, by which Actual Nominal GDP for such Reference Year exceeds the Nominal Base Case GDP for such Reference Year."  Thus, Excess GDP for Reference Year 2013 was ARS 805.9 billion, which represents the difference between Nominal Base Case GDP (ARS 2,533.7 billion) and Actual Nominal GDP (ARS 3,339.6 billion).  (Exhibit X, Row 20.)

154.    Excess GDP is then used to calculate Available Excess GDP. **Available Excess GDP** as defined in the Global Security "means, for any Reference Year, an amount in Argentine pesos equal to (i) 5% of Excess GDP for such Reference Year, multiplied by (ii) the Unit of Currency Coefficient."  The **Unit of Currency Coefficient** is defined in the Global Security to be 0.012225.  (Exhibit X, Row 21.) Accordingly, Available Excess GDP for Reference Year 2013 was ARS 0.49260 per $1.00 USD notional of GDP Securities, *i.e.,* 805.9 multiplied by 0.05 multiplied by 0.012225.  (Exhibit X, Row 22.)

155.    With Available Excess GDP, the Payment Amount can be determined.  **Payment Amount** as defined in the Global Security "means for any Payment Date, an amount equal to (i) the Available Excess GDP (converted into U.S. dollars) for the Reference Year corresponding to such Payment Date, multiplied by (ii) the notional amount of this Security outstanding as of such Payment Date. . . ."  To convert Available Excess GDP into U.S. dollars, the Global Security directs the use of the average free market exchange rate of ARS to USD during the 15 days preceding December 31 of the relevant Reference Year, which for Reference Year 2013 was

6.41407 USD/ARS.  (Exhibit X, Row 23.)  The notional amount of outstanding GDP

Securities was approximately $17.2 billion as of December 15, 2014.  (Exhibit X, Row

26.)  Thus, the Payment Amount due to the Holders for 2013 is $1,321,922,620, *i.e.*,

0.49260 divided by 6.41407 multiplied by $17.2 billion (Exhibit X, Row 27)*, or

$0.07680 per notional dollar of GDP Securities.  (Exhibit X, Row 24.)

**FIRST CLAIM FOR RELIEF**
**(BREACH OF CONTRACT)**

156.    Plaintiffs repeat and re-allege the allegations of paragraphs 1

through 155.

157.    The Republic has breached its contractual obligations under the

Securities in at least four ways.

158.    *First*, the Republic breached the contract by failing to perform

calculations it was obligated to perform.  The contract required the Republic to calculate

the 2013 Adjustment Fraction, adjust 2013 Base Case GDP with that fraction, and then

determine the payment conditions and calculate the Payment Amount with adjusted

Base Case GDP.  The Republic did none of that.

159.    *Second*, the Republic breached its obligations to publish 2013

Actual Real GDP measured in constant 1993 prices by the Calculation Date for

Reference Year 2013 (*i.e.*, November 1, 2014).  The Global Securities require Actual

Real GDP measured in constant 1993 prices published by INDEC as an input for the

contractually-required calculation of the Adjustment Fraction and the other calculations

that depend upon adjusted Base Case GDP.  And INDEC could have published that

data.  INDEC is part of the Republic, the Republic told investors that it controlled

INDEC and that INDEC would publish data called for by the Global Securities.  The

54

Republic could have ensured that INDEC published 2013 Actual Real GDP measured in constant 1993 prices by the applicable Calculation Date, and INDEC would have done so if the President had directed it to do so.  In fact, the Republic discouraged INDEC from publishing the inputs necessary to perform the contractually-specified calculations to avoid its payment obligations.

160.    The Republic was therefore obligated (i) to perform the calculations under the Securities, including following the formula for the Adjustment Fraction, and (ii) to ensure that INDEC published the data contractually required for those calculations.  Indeed, absent such obligations, the terms of the Securities would be ineffective because there would be contractual formulas for payment conditions and Payment Amounts, but no assurance that the inputs for such formulas would ever be available or the calculations ever made.  Moreover, if Argentina has no obligation to publish Actual Real GDP in constant 1993 prices or perform the calculations, and the absence of that data and the calculations means there is no entitlement to payment, then it would render the Securities inherently valueless from the start and subject to the Republic's whim if it refused to publish the necessary figures.  This would be an absurd result.

161.    *Third*, the Republic breached by failing to comply with the "Modifications" provision of the Global Securities—Section 22 of the 2005 Global Security and Section 20 of the 2010 Global Security—and instead attempted to unilaterally change the terms of the contract.  That provision requires that modifications to certain "Reserved Matters," such as a "change [to] the method of calculation of the Payment Amounts," receive the consent of 75% of Holders.  By its "atextual" use of

unadjusted Base Case GDP for 2013 to determine the Base Case GDP Growth threshold and by jettisoning the yearly Adjustment Fractions set forth in the Global Securities for its extra-contractual constant adjustment fraction, the Republic changed the determination of Base Case GDP after a rebasing. And, since Base Case GDP is a necessary input in the calculation of the Payment Amount under the Global Securities, the Republic's use of the constant fraction constitutes a "change [to] the method of calculation of the Payment Amounts."

162. _Finally_, Argentina breached by failing to pay the Holders the Payment Amount due for Reference Year 2013, including without limitation the portion thereof allocable to the Plaintiffs as beneficial owners of Securities. If INDEC had timely published 2013 Actual Real GDP measured in constant 1993 prices, and if the Republic had followed the plain terms of, and performed the calculations required by, the Global Securities, it would have been apparent that the payment conditions had been met for Reference Year 2013 and that the Republic owed a Payment Amount of $1,321,922,620 (or 7.680% of the notional amount of all the GDP Securities issued. The Republic was obligated to make that payment on December 15, 2014, but failed to do so. It owes the Holders the full Payment Amount, plus all applicable pre-judgment interest through the entry of the judgment and post-judgment interest thereafter until payment is made.

### SECOND CLAIM FOR RELIEF
**(BREACH OF THE COVENANT OF GOOD FAITH**
**AND FAIR DEALING AND THE PREVENTION**
**DOCTRINE)**

163. Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 162.

4899-9278-6568.1

164.    *First*, the Republic breached the covenant of good faith and fair dealing implied under New York law.  Under the implied obligation of good faith and fair dealing, the Republic may not: (i) engage in conduct that would have the effect of destroying or injuring the other party's right to receive the fruits of the contract, or (ii) violate a promise that a reasonable person would be justified in understanding was included.

165.    By (i) failing to continue, and, in fact, discouraging, timely publication of Actual Real GDP measured in constant 1993 prices for Reference Year 2013 where it could have; (ii) using unadjusted Base Case GDP for 2013 to determine the Base Case GDP Growth threshold in contravention of the terms of the Global Securities; (iii) adopting an extra-contractual constant adjustment fraction; and (iv) failing to perform the contractually-required calculations for Reference Year 2013, the Republic destroyed the Holders' right to receive the Payment Amount for Reference Year 2013 due under the contract.

166.    Likewise, the investors in the Securities were justified in understanding that the Republic promised to timely publish, and not discourage the timely publication of, Actual Real GDP measured in constant 1993 prices after a rebasing where doing so was necessary to avoid depriving the Holders of the Payment Amount for Reference Year 2013 that was due.  Additionally, investors were justified in understanding that the Republic would perform the calculations required by the Global Securities in accordance with their terms where failing to do so would deprive them of the Payment Amount for Reference Year 2013 that was due.

167.    *Second*, under the prevention doctrine, the Republic may not:
(i) do anything which will have the effect of destroying or injuring the other party's
right to receive the fruits of the contract or (ii) act in such a way as to frustrate or
prevent the occurrence of a condition precedent.

168.    The Republic's conduct—failing to timely publish, and in fact
discouraging, publication of Actual Real GDP measured in constant 1993 prices for
Reference Year 2013 where it could have; using unadjusted Base Case GDP for 2013 to
determine the Base Case GDP Growth threshold in contravention of the terms of the
Global Securities; adopting an extra-contractual constant adjustment fraction; and
failing to perform the contractually-required calculations—had the effect of destroying,
injuring, or impeding Holders' right to receive the Payment Amount for Reference Year
2013 that was otherwise due under the contract.

169.    The Republic has also taken the position that non-publication of
Actual Real GDP measured in constant 1993 prices means the conditions for payment
for Reference Year 2013 cannot be calculated in accord with the plain terms of the
contract.  Thus, by failing to timely publish the data where it could have, the Republic
has also acted in such a way as to frustrate or prevent the occurrence of a condition
precedent.

170.    Because Argentina failed to timely publish Actual Real GDP
measured in constant 1993 prices for Reference Year 2013, Plaintiffs are relieved of any
obligation to rely upon the missing data to establish the Republic's payment obligation
for Reference Year 2013 under the GDP Securities.  Plaintiffs thus are entitled to

establish liability and damages for the Republic's breach of the prevention doctrine by relying on evidence of what that figure was.

171.    While not essential to the cause of action herein, in doing all of the above, Argentina committed manifest error and acted arbitrarily, willfully, and in bad faith.  It knew that a payment would be due for 2013 if INDEC published 2013 Actual Real GDP measured in constant 1993 prices and it followed the plain language of the Global Securities, and such payment would have a significant negative impact on its foreign currency reserves and credit rating.  It knew that the natural and unavoidable consequence of failing to timely publish of 2013 Actual Real GDP measured in constant 1993 prices, discouraging INDEC from doing so, using unadjusted Base Case GDP for 2013 to determine the Base Case GDP Growth threshold in contravention of the terms of the Global Securities, jettisoning the plain language of the Global Securities mandating the application of the yearly Adjustment Fractions, adopting its extra-contractual constant fraction, and failing to perform the calculations required by the Global Securities would be to frustrate the right of Holders to the Payment Amount for Reference Year 2013 under the terms of the contract.

172.    Argentina must be held liable as a matter of law for failing to fulfill its obligations under the implied covenant of good faith and fair dealing and the prevention doctrine and its failure to pay the Payment Amount due for Reference Year 2013.  Under the terms of the GDP Securities, the Republic was contractually obligated to make a Payment Amount in respect of Reference Year 2013 of $0.07680 per $1.00 of notional amount of GDP Securities on December 15, 2014.  As a result of its breaches, Argentina owes a Payment Amount for Reference Year 2013 to the Holders of

$1,321,922,620, plus all applicable pre-judgment interest through the entry of the

judgment and post-judgment interest thereafter until payment is made.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the entry of judgment against the

Republic as follows:

(a)     An order establishing liability for the Republic's breaches of

contract or alternatively for its breach of the covenant of good

faith and fair dealing and/or prevention doctrine;

(b)     An order awarding judgment to the Holders for the Payment

Amount for Reference Year 2013 of $1,321,922,620 or 7.680%

of the notional amount of all the GDP Securities issued, including

without limitation the portion of the Payment Amount for

Reference Year 2013 representing each Plaintiff's beneficial

ownership interest in Securities as follows:

(i)      Plaintiff Aurelius Capital Master, Ltd. for $61,221,826.41;

(ii)     Plaintiff ACP Master, Ltd. for $110,535,424.82;

(iii)    Plaintiff Novoriver S.A. for $14,056,424.14;

(iv)    Plaintiff 683 Capital Partners, LP for $22,374,311;

(v)     Plaintiff Adona LLC for $9,216,000.00;

(vi)    Plaintiff Egoz I LLC for $8,664,576.00;

(vii)   Plaintiff Egoz II LLC for $5,274,624.00;

(viii)  Plaintiff Mastergen, LLC for $42,681,937.00;

(ix)    Plaintiff Erythrina, LLC for $3,678,943.56;

(x)     Plaintiff AP 2016 1, LLC for $7,184,481.56;

(xi)  Plaintiff AP 2014 3A, LLC for $792,883.20;

(xii)  Plaintiff AP 2014 2, LLC for $742,849.46;

(xiii)  Plaintiff WASO Holding Corporation for $64,663,772.93;

(xiv)  Plaintiff Ape Group SpA for $1,382,400.00;

(xv)  Plaintiff Romano Consulting SpA for $1,612,800.00;

(xvi)  Plaintiff Icaro SRL for $384,000.00; and

(xvii)  Plaintiff Elazar Romano for $6,297,600.00;

(c)  Further or alternatively, an order awarding damages to the
Holders, including without limitation damages suffered by the
Plaintiffs on account of their beneficial ownership of Securities;

(d)  An award of pre-judgment interest through entry of judgment and
post-judgment interest thereafter, as applicable; and

(e)  Granting such other relief as the Court deems just and proper.

Dated:  New York, New York
January 14, 2026

FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP

By:  _s/ Edward A. Friedman_
Edward A. Friedman
Daniel B. Rapport
Michael S. Palmieri
7 Times Square
New York, New York 10036
(212) 833-1100

*Attorneys for Plaintiffs Aurelius Capital
Master, Ltd. and ACP Master, Ltd.*

BLEICHMAR FONTI &
AULD LLP

By:  _s/ Evan A. Kubota_
Javier Bleichmar
Evan A. Kubota
300 Park Avenue, Suite 1301
New York, NY 10022
(212) 789-1347

*Attorneys for Plaintiff Novoriver S.A.*

PERKINS COIE LLP

By:      s/ Matthew M. Ricciardi
       Matthew M. Ricciardi
       H. Rowan Gaither IV
1155 Ave. of the Americas, 22nd Floor
New York, New York 10036-2711
(212) 530-1800

*Attorneys for Plaintiff 683*
*Capital Partners, LP*

LATHAM & WATKINS LLP

By:      s/ Matthew S. Salerno
       Matthew S. Salerno
       Ryan M. Schachne
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

*Attorneys for Plaintiffs Adona LLC; Egoz*
*I LLC; Egoz II LLC; Mastergen, LLC;*
*Erythrina, LLC; AP 2016 1, LLC; AP*
*2014 3A, LLC; AP 2014 2, LLC; and*
*WASO Holding Corporation*

LAW OFFICES OF ERIC J. GRANNIS

By:      s/ Eric J. Grannis
       Eric J. Grannis
11 Broadway, Suite 615
New York, New York 10004
(212) 903-1025

*Attorneys for Plaintiffs Ape Group SpA;*
*Romano Consulting SpA; Icaro SRL;*
*and Elazar Romano*